1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TRISTAN ROSE PERKINS, Independent Administratrix of Succession of the Decedent GERALDINE RABB PERKINS,<br><br>                              Plaintiff,<br><br>       v.<br><br>UNITED STATES of AMERICA,<br><br>                              Defendant. | No.<br><br>COMPLAINT FOR WRONGFUL DEATH AND SURVIVORSHIP |

Plaintiff, Tristan Rose Perkins, for herself and as the Independent Administratrix of Succession of the Decedent, Geraldine Rabb Perkins, by and through her attorneys of record, hereby files this Complaint against Defendant United States of America, and states as follows:

1.      This action arises under the Federal Tort Claims Act, 28 U.S.C. §§1346(b), 2671-2680.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

# I. PARTIES

2.    Decedent, Geraldine Rabb Perkins, was—at the relevant time of her para-occupational and environmental exposure to asbestos that is the subject of this Complaint—a resident of the state of Washington.

3.    Plaintiff and Decedent are and were at the time of Geraldine Rabb Perkins' diagnosis with mesothelioma and subsequent death residents of the State of Louisiana.

4.    Plaintiff currently resides at ███████████████████████ New Orleans, Louisiana 70130.

5.    Defendant, the United States of America, at all times mentioned herein, owned, maintained, managed, and/or controlled Puget Sound Naval Shipyard and the ships and facilities at the shipyard where Harang Joseph Perkins worked between 1968 and 1974.

## II. JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1391(e), because the defendant is the United States of America.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Geraldine Rabb Perkins was injured by exposure to asbestos and asbestos-containing products in this district, and Defendant is subject to personal jurisdiction within the district.

5.    Plaintiff's decedent, Geraldine Rabb Perkins, resided within one mile of Puget Sound Naval Shipyard and lived with—and laundered the contaminated clothing of—her husband, Harang Joseph Perkins. At the time of the incidents that are the subject of this Complaint, Harang Joseph Perkins was enlisted in the United States Navy and based out of Puget Sound Naval Shipyard. The claim arose in Kitsap County.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

6.      More than six months before this action was instituted, pursuant to 28 U.S.C. § 2675(a), the claim set forth herein was received by the appropriate agency of the United States on or about February 3, 2022. Said agency having failed to make a final disposition of the claim within six months of that time, Plaintiff deems such failure to be a denial thereof.

### III. FACTS OF THE CASE

**_Background on Decedent's Husband_**

7.      Harang Joseph Perkins ("H.P.") was born on ███████ 1933.

8.      H.P. enlisted in the United States Navy in New Orleans on or about February 17, 1959.

9.      From roughly May of 1961 on, H.P. served as a Machinist's Mate, progressing from the rank of MM3 to MM1.

10.     While in the United States Navy, H.P. was stationed on the following vessels during the following approximate periods:

- _USS Mount Katmai_ (AE-16) (1959-1961).

- _USS Ajax_ (AR-6) (1961-1963).

- _USS Rockbridge_ (APA-228) (1963).

- _USS Lindenwald_ (LSD-6) (1964).

- _USS Raleigh_ (LPD-1) (1965-67).

- _USS Everglades_ (AD-24) (1967-1968).

- _USS Sacramento_ (AOE-1) (1970-1972).

11.     H.P. permanently retired from the United States Navy on May 10, 1975.

12.     H.P. died four years later, on July 9, 1979, in Marrero, Louisiana.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSIHP - 3

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

13.     During the time H.P. served in the United States Navy, the Navy specified and utilized many asbestos-containing materials, including gaskets, packing, pipe insulation, insulating cements, adhesives, and other materials as exemplified by the products that were included on many of the Navy's Qualified Products Lists in effect prior to and during H.P.'s naval service, including, but not limited to:

- QPL-2781 under MIL-I-2781 for "Insulation, Pipe, Thermal."

- QPL-2819 under MIL-I-2819 for "Insulation Block, Thermal."

- QPL-2861 under MIL-I-2861 for "Cement, Insulation, High-Temperature."

- QPL-17303 under MIL-P-17303 for "Packing Materials, Plastic Metallic and Plastic Nonmetallic."

- QPL-17303 under MIL-P-17303 for "Packing Materials, Plastic Metallic and Plastic Nonmetallic."

- QPL-17472 under MIL-A-17472 for "Asbestos Sheet Compressed (Packing Material)."

- QPL-16265 under MIL-G-16265 for "Gaskets, Metallic-Asbestos, Spiral-Wound (For Navy Flanged Joints in Piping Systems)."

- QPL-7021 on under MIL-A-7021 for "Asbestos Sheet, Compressed, For Fuel, Lubricant, Coolant, Water, and High Temperature Resistant Gaskets."

- QPL-HH-P-46 under HH-P-46 (Navy Ships) for "Packing Material (Asbestos Sheet Compressed)."

- QPL-15342 under MIL-G-15342 for "Gaskets, Metallic Asbestos, Spiral Wound, For Boilers."

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSIHP - 4

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

14.     The Department of Veterans Affairs Office of Public Health notes (*available at* https://www.warrelatedillness.va.gov/education/factsheets/asbestos-exposure.pdf) that the following categories of service members were at risk for asbestos exposure:

- "Navy Veterans who served on ships whose keels were laid before 1983 . . ."

- "Navy Veterans who worked in ship yards from the 1930s through the 1990s, as asbestos was widely used in ship building and construction materials during that time frame . . ."

- "Navy personnel who worked below deck before the early 1990s. . ."

- "Navy Seamen who were frequently tasked with removing damaged asbestos lagging in engine rooms and then using asbestos paste to re-wrap the pipes, often with no respiratory protection and no other personal protective equipment especially if wet technique was not used in the removal . . ."

- "Service members who worked with, handled, damaged or disturbed any ACM [asbestos-containing material] may have had some asbestos exposure as a result."

15.     Throughout his time in the United States Navy, H.P. regularly worked with asbestos-containing products (e.g., gaskets, packing, insulation) and worked in environments that were replete with asbestos-containing materials, and consequently had innumerable opportunities for exposure to friable and respirable asbestos.

16.     As a result of his work in the United States Navy, H.P.'s person and clothing were regularly contaminated with asbestos fibers, creating the potential for para-occupational asbestos exposures to his spouse and family members.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSIHP - 5

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 • Seattle, WA 98101
Phone (206) 622-8000 • Fax (206) 682-2305

### *Background on the Decedent and Her Beneficiaries*

17.     Geraldine Rabb was born in Woodinville, Mississippi on ███████ 1943.

18.     Geraldine Rabb met H.P. while he was serving in the United States Navy in the early 1960s.

19.     Geraldine Rabb and H.P. were married on December 25, 1963, in Norfolk, Virginia.

20.     Geraldine Rabb Perkins and H.P. had five children: Lisa Perkins (born in 1964); Jill Perkins (born in 1967); Kwame Perkins (born in 1969); Tristan Rose Perkins (born in 1973); and Enola Perkins (born in 1974).

21.     H.P. was transferred to Bremerton, Washington on or about December 16, 1968, and Geraldine Rabb Perkins and H.P. moved to Bremerton following the transfer.

22.      Shortly thereafter, the Perkins family moved into a house located at 3733 D. Street in Bremerton, Washington where they lived until the family moved to Corpus Christi, Texas in approximately 1974.

23.     The residence at 3733 D. Street in Bremerton, Washington was situated less than one mile from Puget Sound Naval Shipyard.

24.     At times, the area of the Perkins' family residence at 3733 D. Street in Bremerton was downwind from the Puget Sound Naval Shipyard. During times that the prevailing winds were flowing from the direction of the Puget Sound Naval Shipyard toward the Perkins' home, asbestos fiber released at the Shipyard caused environmental asbestos exposure in and around the vicinity of the Perkins' family home.

25.     During the 1968 to 1974 time period, asbestos and asbestos-containing products were removed and installed at the Puget Sound Naval Shipyard in a manner that did

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

not limit the release and dispersal of asbestos-containing dust and asbestos fiber into the atmosphere.

26.     There is no indication H.P. was ever provided any specialized protective clothing (e.g., coveralls) or laundry service during the ripout and installation of asbestos-containing products to limit or prevent his asbestos-contaminated person and clothing from leaving the worksite, contaminating his home, and unwittingly exposing his spouse and children to asbestos brought home from the worksite.

27.     During the time the Perkins family lived in Bremerton, Geraldine Rabb Perkins laundered H.P.'s work clothing. Geraldine Rabb Perkins also regularly laundered bags of dirty laundry that H.P. accumulated while being away at sea or on assignment.

28.     Geraldine Rabb Perkins laundered H.P.'s clothing separately as a matter of course.

29.     Geraldine Rabb Perkins would shake and separate H.P.'s work clothes prior to washing them, allowing dirt and dust from the clothing to go airborne and into her breathing zone.

30.     The laundry room at 3733 D. Street in Bremerton was located in an enclosed room just off of the kitchen of the house.

31.     While living in Bremerton, Geraldine Rabb Perkins was unwittingly exposed to asbestos from environmental exposure emanating from the activities at Puget Sound Naval Shipyard and while laundering her husband's asbestos-contaminated clothing.

32.     Geraldine Rabb Perkins was diagnosed with mesothelioma on or about February 21, 2020.

33.     On June 6, 2020, Geraldine Rabb Perkins died.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSIHP - 7

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

34.     Her immediate cause of death was listed as mesothelioma.

35.     Geraldine Rabb Perkins is survived by her five adult daughters.

### *The Hazards Posed by Asbestos Exposure*

36.     Asbestos is a generic commercial designation for a variety of naturally occurring mineral silicate fibers that are found in bundles.

37.     Asbestos has been in widespread commercial use for over 100 years.

38.     Asbestos is used in a variety of different manners such as being: (a) bonded with other materials (e.g., Portland cement, plastics, resins), (b) used as a loose fibrous mixture, or (c) woven as a textile.

39.     Asbestos fibers are chemically inert in that they do not evaporate, dissolve, burn, or undergo significant reactions with most chemicals.

40.     Asbestos fibers are resilient and do not undergo significant degradation in the environment.

41.     Asbestos has historically been incorporated into a variety of products, including, but not limited to: thermal insulation, gaskets, packing, coating and compounds, flooring, paper, textiles, and millboard.

42.     Asbestos fibers can be released into the air by the disturbance of asbestos-containing material during product use, handling, demolition, maintenance, repair, disturbance, and removal.

43.     Although asbestos fibers are regularly detected in the ambient air, they are typically found in exceptionally small concentrations between 0.00001 to 0.0001 fibers per milliliter (fiber/mL) in rural and urban areas respectively. *See* Toxicological profile for

asbestos. U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry at F-19.

44.     Exposure to asbestos, including chrysotile asbestos, causes cancer of the lung, larynx, ovaries, and mesothelium. Asbestos exposure is also responsible for the causation of other diseases such as asbestosis and plaques, thickening, and effusion in the pleura.

45.     Mesothelioma is a dose response disease. Cumulative exposure to asbestos, even at low levels, entails an increased risk of mesothelioma of the pleura.

46.     Governmental agencies (including the Occupational Health and Safety Administration, National Institute for Occupational Safety & Health, Center for Disease Control, National Institutes of Health, and Environmental Protection Agency) and non-governmental agencies (including the International Agency for Research on Cancer, World Health Organization, and International Labour Organization) that have considered the scientific evidence and literature concerning asbestos exposure and mesothelioma have concluded that there is no threshold level of asbestos exposure that has been shown not to cause mesothelioma:

- "Finally, the available evidence suggests a gradient of effects from direct occupational, to indirect occupational exposure, to indirect occupational exposure to families of workers exposed to asbestos ... [t]his suggests that there are levels of asbestos exposure that will not be associated with any detectable risk, although these levels are not known." Background Information on Development of National Emission Standards for Hazardous Air Pollutants: Asbestos, Beryllium, and Mercury, U.S. Environmental Protection Agency at 22, 29 (March 1973).

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

- "Excessive cancer risks have been demonstrated at all fiber concentrations studied to date. Evaluation of all available human data provides no evidence for a threshold or a 'safe' level of asbestos exposure." NIOSH, <u>Revised Recommended Asbestos Standard</u>, DWEW (NIOSH) Publication No. 77-169 at 92 (December 1976).

- "All levels of asbestos exposure studied to date have demonstrated asbestos related disease ... there is no level of exposure below which clinical effects do not occur." <u>NIOSH-OSHA Asbestos Work Group, Workplace Exposure to Asbestos, Review and Recommendations</u>, DHHS (NIOSH) Pub. No. 81-103 at 3 (1980).

- "It is important to point out that when a permissible level for exposure (PEL) to a certain carcinogen is set by OSHA, there is no implication that such a level is safe. To the contrary, it is the agency's policy that any occupational exposure to a carcinogen carries with it some risk of disease, even if it cannot be easily or precisely measured." <u>First Annual Report on Carcinogens</u>, Department of Health & Human Services at 139 (July 1980).

- "[R]educing exposure to 0.1 f/cc would further reduce, but not eliminate, significant risk. The 0.1 f/cc level leaves a remaining significant risk." Occupational Exposure to Asbestos, 59 Fed. Reg. 40,964-41,162 (Aug. 10, 1994) (revising 29 C.F.R. § 1910.1001).

- "Exposure to chrysotile asbestos poses increased risks for asbestosis, lung cancer and mesothelioma in a dose-dependent manner. No threshold has been identified for carcinogenic risks." <u>Chrysotile Asbestos - Environmental Health Criteria 203</u>, United Nations Environment Programme at 144 (1998).

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

- "Asbestos is a proven human carcinogen (IARC Group 1). No safe level can be proposed for asbestos because a threshold is not known to exist. Exposure therefore should be kept as low as possible." Air Quality Guidelines for Europe (Second Edition), World Health Organization Regional Office for Europe at 133 (2000).

-  "All forms of asbestos cause cancer . . . and no threshold has been identified for carcinogenic risks." Chrysotile Asbestos, World Health Organization at 3 (2014).

- "There is no 'safe' level of asbestos exposure for any type of asbestos fiber," " [e]pidemiologic evidence has increasingly shown that all asbestos fiber types, including the most commonly used form of asbestos, chrysotile, causes mesothelioma in humans," and  "[a]sbestos exposures as short in duration *as a few days* have caused mesothelioma in humans." What is Asbestos, Occupational Safety and Health Administration, https://www.osha.gov/asbestos.

47.     Mesothelioma is a rare type of cancer that affects tissues that line the inside of the chest and abdomen.

48.     The overwhelming majority of cases of mesothelioma, particularly cases of pleural mesothelioma, are attributable to asbestos exposure.

49.     Malignancy develops slowly, and the latency period is usually 20 to 50 years after the first exposure to asbestos.

50.     Mesothelioma's survival rate is typically four to 18 months after diagnosis.

51.     Mesothelioma is an incurable, painful, and invariably fatal disease.

_**The Hazards of Para-Occupational Asbestos Exposures**_

52.    The potential for injury from take-home (or para-occupational) exposure to toxic substances has been recognized in the fields of medicine and industrial hygiene since the early 1900s.

53.    The potential for injury from take-home (or para-occupational) exposure to asbestos has been recognized for over 60 years.

54.    In 1960, researchers published a report associating pleural mesothelioma with exposure to crocidolite asbestos. *See* J.C. Wagner et al., <u>Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province</u>, 17 Brit. J. Indus. Med. 260 (1960).

55.    This publication described a case of pleural mesothelioma in a female that did not have direct occupational exposure to asbestos, but whose father was an asbestos miner in South Africa. *See id.* at 266.

56.    In April 1964, the Journal of the American Medical Association published an article entitled "Asbestos Exposure and Neoplasia" which examined, in part, the incidence of a variety of cancers among insulation workers. *See* Irving J. Selikoff et al., <u>Asbestos Exposure and Neoplasia</u>, 188 JAMA 22 (1964).

57.    Researchers further noted that indirect asbestos exposures were a grave concern:

> Asbestos exposure in industry will not be limited to the particular craft that utilizes the material. The floating fibers do not respect job classifications. Thus, for example, insulation workers undoubtedly share their exposure with their workmates in other trades; intimate contact with asbestos is possible for electricians plumbers, sheet metal workers, steamfitters, laborers, carpenters, boiler makers, and foremen; perhaps even the supervising architect should be included.

*Id.* at 26.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

58.     A 1965 article offered two examples of individuals diagnosed with mesothelioma who had no documented history of asbestos exposure, but nonetheless had asbestos bodies and fibers found in their lungs on autopsy. One of the individuals at issue denied ever having seen, used, or handed any asbestos products. The other involved an individual who worked in a dry-cleaning facility as a spotter. *See* Irving J. Selikoff et al., <u>Relation Between Exposure to Asbestos and Mesothelioma</u>, 272 New Eng. J. Med. 560 (1965).

59.     The same year, other researchers published a study of 83 mesothelioma patients from London Hospital. The article included a section regarding "Domestic Exposures" that noted the following:

> The group of nine, seven women and two men, whose relatives worked with asbestos, are of particular interest. The most usual history was that of the wife who washed her husband's dungarees or work clothes. In one instance a relative said that the husband, a docker, came home 'white with asbestos' every evening for three or four years and his wife brushed him down. The two men in this group, when boys of 8 or 9 years old had sisters who were working at an asbestos factory. One of these girls worked as a spinner from 1925 to 1936. In 1946 she died of asbestosis. The press report of the inquest states: 'She used to return home from work with dust on her clothes'. Her brother had apparently no other exposure to asbestos; he started work as a shop assistant, then became a sawyer of iron girders until 1948 when he worked as a loader of groceries in the docks for five years (but never on dusty cargoes) and then returned to sawing iron girders. He died in 1956 of a pleural mesothelioma.

Muriel L. Newhouse & Hilda Thompson, <u>Mesothelioma of Pleural and Peritoneum Following Exposure to Asbestos in the London Area</u>, 22 Brit. J. Indus. Med. 261, 264 (1965).

60.     By 1965, Newhouse and Thompson were able to definitively state "[t]here seems little doubt that the risk of mesothelioma may arise from both occupational and domestic exposures to asbestos." *Id.* at 266.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

61.     Further confirmation of the potential hazards of take-home asbestos exposure was documented in another 1965 publication: Raimo Kiviluoto, <u>Pleural Plaques and Asbestos: Further Observations on Endemic and Other Nonoccupational Asbestosis</u>, 132 Annals N.Y. Acad. Sci. 235 (1965).

62.     In that paper, Raimo Kiviluoto noted four identified cases of pleural plaques found during routine chest examinations over an 18-month period in 1963-1964 that deserved "special attention" as the female patient and her three sisters all suffered from pleural changes despite the fact that their only possible connection to asbestos exposure was via their father who had been occupationally exposed to mixed dusts 50 years ago. *See id.* at 238.

63.     Three additional cases of take-home asbestos exposure causing mesothelioma were evaluated in a 1967 study that examined 42 cases of mesothelioma from 152 hospitals over a five-year period. Jan Lieben & Harry Pistawka, <u>Mesothelioma and Asbestos Exposure</u>, 14 Arch. Environ. Health 559 (1967).

64.     Two of the three mesothelioma patients with family contacts related to asbestos lived in households where one or more of their family members worked at insulation manufacturing facilities. The third patient, a 67-year-old woman, never had any occupational asbestos exposure, but was exposed to asbestos from her two sons who worked as insulators at a shipyard. *See id.* at 561.

65.     A detailed 1968 case report documented a case of take-home mesothelioma involving a 71-year-old woman who was exposed to asbestos "over a period of a year or two" from laundering the clothing of her three daughters who worked in a factory that utilized asbestos. N. Lloyd Rusby, <u>Pleural Manifestations Following the Inhalation of Asbestos in relation to Malignant Change</u>, 54 J. R. Nav. Med. Serv. 142 (1968).

66.     Another case report of take-home asbestos exposure causing mesothelioma was published in 1969. James Milne, <u>Fifteen cases of pleural mesothelioma associated with occupational exposure to asbestos in Victoria</u>, 2 Med. J. Aust. 669 (1969) (describing case of take-home mesothelioma involving the daughter of an individual who worked for an asbestos-cement firm).

67.     Throughout the 1970s, additional case reports, case series, case controls, and cohort studies were published which detailed the hazards of take-home (or para-occupational) exposure to asbestos, including numerous cases involving shipyard-related take-home exposure. *See, e.g.,* Thomas Ashcroft & A.G. Heppleston. <u>Mesothelioma and Asbestos in Tyneside: A Pathological and Social Study</u>, paper read at Pneumoconiosis at Johannesburg (1970);  P. Champion, <u>Two Cases of Malignant Mesothelioma After Exposure to Asbestos</u>, 103 Am. Rev. Respir. Dis. 821 (1971); Richard M. Heller et al., <u>The Radiological Manifestations of Malignant Pleural Mesothelioma</u>, 108 Am. J. Roentgenol. Radium Ther. Nucl. Med. 53 (1970); J. Knappmann,  <u>Beobachtungen an 251 Obduzierten Mesotheliom-Fällen in Hamburg (1958–1968)</u>, 148 Pneumonologie 60 (1972); F.P. Li et al., <u>Familial Mesothelioma After Intense Asbestos Exposure at Home</u>, 240 JAMA 467 (1978); G.A. Lillington et al., <u>Letter: Conjugal Malignant Mesothelioma</u>, 291 N. Engl J Med 583 (1974); A.D. McDonald et al., <u>Epidemiology of Primary Malignant Mesothelial Tumors in Canada</u>. 26 Cancer 914 (1970); J. McEwen et al., <u>Asbestos and Mesothelioma in Scotland. An Epidemiological Study</u>, 28 Int. Arch. Arbeitsmed. 301 (1971);  G.F. Rubino, G. Scansetti, A. Donna, & G. Palestro, <u>Epidemiology of Pleural Mesothelioma in North-western Italy (Piedmont)</u>, 29 Br J Ind Med 436 (1972); N.J. Vianna & A.K. Polan, <u>Non-Occupational Exposure to Asbestos and Malignant Mesothelioma in Females</u>, 1 Lancet 1061 (1978).

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

68.     Subsequent studies have consistently reaffirmed the hazards posed by take-home (or para-occupational) exposure to asbestos and its potential to cause mesothelioma.

### *The Hazards of Environmental Asbestos Exposure*

69.     Medical and scientific literature has repeatedly demonstrated that environmental (or neighborhood) exposure to asbestos from point sources increases the incidence of asbestos-related diseases in the vicinity of those sources.

70.     In 1960, Wagner et al. reported on 33 cases of diffuse pleural mesothelioma in South Africa, many of which had exposure simply from living in the vicinity of the asbestos mines—but never had any occupational exposure. *See* J.C. Wagner et al., Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province, 17 Brit. J. Indus. Med. 260 (1960).

71.     Another 1960 paper found calcifications of the pleura on x-ray examination of a significant number (approximately 500) of residents living near anthophyllite mines in Finland who had no other sources of asbestos exposure. Raimo Kiviluoto, Pleural Calcification as a Roentgenologic Sign of Non-Occupational Endemic Anthophylliteasbestosis, 194 Acta. Radiol, 1 (1960). Calcified pleural plaques are considered pathognomonic, or objective evidence of, prior asbestos exposure.

72.     In a follow-up publication to his 1960 paper, Wagner reported that he had identified 75 individuals diagnosed with mesothelioma within the vicinity of the Cape Asbestos fields. A significant portion of the 75 people had "not been employed by the asbestos industry" and only "had environmental exposure due to living in the vicinity of the mills and dumps. . ." J.C. Wagner, Epidemiology of Diffuse Mesothelial Tumor: Evidence of

an Association from Studies in South Africa and the United Kingdom, 132 Annals N.Y. Acad. Sci. 575, 576 (1965).

73.     In 1965, Newhouse and Thompson studied 67 individuals afflicted with pleural and peritoneal mesothelioma from London Hospital. The researchers identified 11 "neighborhood" exposure cases of the 76 individuals who resided near asbestos manufacturing facilities in London in which the individuals had neither occupational asbestos exposures nor family members in the home who worked with asbestos. *See* Muriel Newhouse & Hilda Thompson, Mesothelioma of Pleura and Peritoneum Following Exposure to Asbestos in the London Area, 22 Brit. J. Indus. Med. 261, 264 (1965).

74.     The same year, researchers in Finland documented emissions of anthophyllite asbestos from mines in Finland in two surveys. The researchers found that the concentration of deposited asbestos fibers was inversely related to distance from the mine, with measurable amounts of asbestos being detected as far away as 11.5 kilometers. In the second survey, trace amounts of asbestos emissions were located as far as 50 kilometers from the mines. *See* A. Laamanen et al., Observations on Atmospheric Air Pollution Caused by Asbestos, 132 Annals N.Y. Acad. Sci. (1965).

75.     In 1967, Lieben and Pistawka reported eight "neighborhood cases" of mesothelioma involving nonoccupationally exposed individuals who lived or worked in close proximity to a variety of asbestos industries. *See* Jan Lieben & Harry Pistawka, Mesothelioma and Asbestos Exposure, 14 Arch. Evniron. Health 559 (1967).

76.     A 1972 publication entitled Asbestos Air Pollution summarized, in part, some of the extant research about the hazards of environmental asbestos exposures, noting that "[e]arly in the 1960s, the problem of asbestos disease was disseminated from the

occupational area into the general environment." Irving J. Selikoff et al., <u>Asbestos Air Pollution</u>, 25 Arch. Environ. Health 1 (1972). The article stressed that "housekeeping in all asbestos-using facilities may turn out to be a knotty problem, and ultimately associated with much asbestos air pollution." <em>Id</em>. at 12.

77.     In 1974, Morris Greenberg and T.A. Lloyd Davies reported on eight cases of neighborhood mesothelioma in England including two cases involving individuals who resided near a shipyard. <u>Mesothelioma Register 1967-68</u>, 31 Brit. J. Indust. Med. 91 (1974).

78.     The same year, E. Hain and P. Dalquen reported on 20 cases of mesothelioma among residents who lived within one kilometer of Hamburg-area asbestos-using industries for a minimum of 5 years who had no other known asbestos exposures. <u>Katamnestische Untersuchungen zur Genese des Mesothelioms</u>, 33 Int. Arch. Arbeitsmed. 15 (1974).

79.     Subsequent studies have only reaffirmed the hazards posed by neighborhood asbestos exposures:

- Researchers have documented cases of environmental asbestos exposure from Cyprus chrysotile mines resulting in mesothelioma. K. McConnochie et al., <u>Mesothelioma in Cyprus: The Role of Tremolite</u>, 42 Thorax 342 (1987).

- Australian researchers published on elevated environmental contamination and excess occurrences of mesothelioma among residents of Wittenoom who were not occupationally or para-occupationally exposed to crocidolite from the mines in the area. Janice Hansen et al., <u>Malignant Mesothelioma After Environmental Exposure to Blue Asbestos</u>, 54 Int. J. Cancer. 578 (1993). Follow up studies further confirmed the hazards posed by environmental asbestos exposure. <em>See</em> Janice Hansen et al., <u>Mesothelioma After Environmental Crocidolite Exposure</u>, 41 Ann. Occup. Hyg. 189

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

(1997); Janice Hansen et al., <u>Environmental Exposure to Crocidolite</u>, 157 Am. J. Respir. Crit. Care. Med. 69 (1998).

- In 1997, Michael Berry published a paper documenting the historically elevated rated of mesothelioma among environmentally exposed residents of Manville, New Jersey who lived in proximity to an asbestos manufacturing facility. <u>Mesothelioma Incidence and Community Asbestos Exposure</u>, 75 Environ. Res. 34 (1997).

- Another study published in 1998 found a seven-fold increased risk for pleural cancer arising from environmental exposure to chrysotile from mines in Quebec. Michel Camus et al., <u>Nonoccupational Exposure to Chrysotile Asbestos and Lung Cancer</u>, 338 N. Engl. J. Med. 1565 (1998).

- In 2002, researchers documented the risk of mesothelioma for Turkish villagers environmentally exposed to asbestos-contaminated soil to be 88.3 times greater for men and 799 times greater for women in comparison to background incidence rates. Selma Metintas et al., <u>Malignant Mesothelioma Due to Environmental Exposure to Asbestos: Follow-Up of a Turkish Cohort Living in a Rural Area</u>, 122 Chest 2224 (2002).

- A 2005 study detailed the risks of developing mesothelioma for residents living in proximity to naturally-occurring asbestos deposits. Xue-lel Pan et al., <u>Residential Proximity to Naturally Occurring Asbestos and Mesothelioma Risk in California</u>, 172 Am. J. Respir. Crit. Care Med. 1019 (2005). The study found that the odds of developing mesothelioma were inversely related to the distance from the asbestos deposits, with the odds decreasing approximately 6.3% for every 10 km from the source. *Id*. at 1019.

- R.M. Gaafar and N.H. Aly Eldin published a study documenting an epidemic of mesothelioma in Egypt where 64.7% of the patients had environmental exposure from several factories that utilized asbestos within a 5 km radius of residential neighborhoods. Epidemic of Mesothelioma in Egypt, 49S1 Lung Cancer S17 (2005).

- A 2007 paper documented significantly elevated mesothelioma rates around an asbestos-product factory in Casale Monferrato. Milena M. Maule et al., Modeling Mesothelioma Risk Associated with Environmental Asbestos Exposure, 115 Environ. Health Persp. 1066 (2007). The study found a statistically significant risk (almost six-fold increase in expected mesothelioma rates) up to 11 kilometers from the factory. Id. at 1070.

- In 2008, Italian researchers reported several mesothelioma cases among residents who lived in close proximity to a chrysotile mine, but who had no definite or likely occupational exposure to asbestos. D. Mirabelli et al., Excess of Mesotheliomas After Exposure to Chrysotile in Balangero, Italy, 65 Occup. Environ. Med. 815 (2008).

- In 2009, researchers documented a 26-fold increased risk of pleural mesothelioma for residents of Cairo who lived near an asbestos-cement factory. M.T. Madkour et al., Environmental Exposure to Asbestos and the Exposure-Response Relationship with Mesothelioma, 15 E. Med. Health J. 25 (2009).

80.     Carl A. Mangold, Puget Sound Naval Shipyard's former Industrial Hygienist, conducted a study in 1982 that measured, in part, the levels of airborne asbestos fibers adjacent to Puget Sound Naval Shipyard up- and downwind from the Shipyard. *See* Carl Mangold, The Actual Contribution of Garlock Asbestos Gasket Materials to the Occupational Exposure to Asbestos Workers, Environmental Control Sciences, Inc. (1982). The data

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

collected revealed "surprisingly high" and "substantially elevated airborne [asbestos] levels near the industrial area of PSNS" several blocks from the Shipyard. *Id*. at 20. The ten-day average of the monitoring was 0.02 asbestos fibers greater than 5 μm in diameter per cubic centimeters (f/cc) based on an eight-hour time-weighted average. *Id*. at 23. These ambient asbestos levels detected by Mr. Mangold are orders of magnitude greater than ambient asbestos concentrations typically found in urban areas. *See* Toxicological profile for asbestos. U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry at F-19; *see also* Meghan Glynn et al., <u>Ambient Asbestos Fiber Concentrations and Long-Term Trends in Pleural Mesothelioma Incidence between Urban and Rural Areas in the United States (1973-2012)</u>, 38 Risk Analysis 3 at 455 (2018) (noting that asbestos-specific airborne concentration measurements for ambient levels are in the range of 0.0003 to 0.0047 f/cc for samples analyzed using transmission electron microscopy and for fibers greater than 5 μm in length).

### ***Relevant Navy Asbestos Regulations***

81.     The United States Navy issued the first mandatory asbestos control rules for individuals not working directly with asbestos, called NAVMAT P-5100, in March 1970.

82.     The March 1970 rules required, in part, the following:

(2)  Personnel engaged in ripout operations will be required to wear clean coveralls at the beginning of each shift. Prior to removing the dust respirator, used coveralls shall be removed. Clean or single use coveralls shall be provided daily.

(3) Shipboard "ripout" of insulation shall be accomplished in designated exclusion areas. Only personnel whose work requires their presence shall be permitted in such areas. All personnel entering such areas shall be made aware of the hazards. Ships' force (crewmen) and others accomplishing essential duties in the removal area are required to wear approved respirators.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

(4) The area in which removal takes place shall be confined by means of curtains, portable partitions, etc. to prevent excessive contamination of other areas.

(5) Portable mechanical exhaust ventilation should be used to removed airborne dust and exhausted into bags or suitable devices to collect the dust.

. . .

(9) Dust shall not be exhausted into other working areas.

83.     In February 1971, the Navy issued NAVSHIPS INSTRUCTION 5100.26, which set forth additional rules for asbestos fabrication, installation, and removal of asbestos.

84.     The February 1971 rules required the following with respect to the fabrication of asbestos-containing materials.

(1) Asbestos operations should be segregated from other operations so as not to expose other personnel to asbestos dusts. If the work cannot be separated, personnel in immediately adjacent areas will wear a Bureau of Mines approved respirator for irritant dusts and other prescribed, personal, protective equipment. . .

(2)  The handling and fabrication areas will be restricted to the necessary workers, supervisors and inspection personnel directly concerned with the asbestos operations. Casual visitors or passers-by will be restricted from entry into any area where asbestos containing materials are being fabricated. All supervisors, workers, inspectors, etc., will wear approved respirators for irritant dusts when they are working with dry material containing asbestos or are in asbestos-contaminated areas of work spaces.

(3) Asbestos cloth cutting tables or benches provided with adequate local exhaust ventilation should be used whenever cutting operations are performed. Exhaust air containing asbestos dust will not be dispersed into the atmosphere without being adequately filtered. . .

(8) Industrial type vacuum cleaners should be used to pick up dusts and scrap . . . Dry sweeping of scrap or dust should not be permitted. . .

(16) Adequate warnings sign . . . will be posted at all entrances to the fabrication shop sites to alert workers and other personnel that asbestos operations are in progress.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

(17) The Industrial Hygienist Should make frequent inspection of the Fabrication and Installation sites to check the level of airborne contamination. The Threshold Limit Value (TLV) for airborne asbestos is 5 fibers greater than 5 microns per milliliter. If this TLV is exceeded, the industrial Hygienist will assist the shop foreman in designing better preventive measures to control the airborne contamination. Asbestos installation, fabrication or removal operations should be suspended until the proper TLV can be maintained so as to protect the workers and others in the area.

(18) Cement bags will be opened wide to permit emptying of the contents without shaking. The material should be made into a slurry as quickly as possible to prevent dust generation. Empty bags will be wet down and placed in a waste container.

85.    For installation, the February 1971 rules required:

(2) Unpacking and application of insulation materials at the installation site will be done in such a manner that will minimize airborne dust.

(3) The area around the installation procedures should be isolated when possible. Adequate warning signs (enclosure (1)) will be posted. Only persons whose work requires their presence should be permitted in such areas. If airborne asbestos dust is present, they will wear Bureau of Mines approved respirators for dust or leave the area.

(4) The Industrial Hygienist will be requested to determine suitable methods for preventing large scale contamination of machinery and engine spaces when installation or removal operations are performed
in these areas.

(5) Suitable waste contains lined with disposable plastic bags will be kept available at the installation site so that discarded or scrap insulation materials can be immediately placed in them. . .

(8) Portable dust collectors/industrial-type vacuum cleaners should be placed in use at the point of operations within confined spaces when possible.

(9) Decks and spaces contaminated by insulation debris will not be dry swept . . .

(10) Workers performing insulation work should be provided with clean paper coveralls when dusty conditions are to be encountered. . . Contaminated coveralls will be disposed of by placement in the asbestos scrap bag.

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSIHP - 23

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

86.     For removal of asbestos-containing materials, the February 1971 rules required, in part, the following:

(2) The area around the Removal procedures should be isolated when possible. Adequate warning signs . . . will be posted Only persons whose work requires their presence will be permitted in such areas. If airborne asbestos dust.is present, they will wear Bureau of Mines approved respirators for irritant duets or leave the area.

(3) The area around the Removal procedures should be isolated when possible. Adequate warning signs (enclosure (1)) will be posted. Only persons whose work requires their presence should be permitted in such areas. If airborne asbestos dust is present, they will wear Bureau of Mines approved respirators for dusts or leave the area.

(4) The areas in which asbestos removal takes place will be confined when possible by means of curtains, portable partitions, drop cloths, etc., to prevent excessive contamination of other areas.

(5) In removal operations that involve dusty work, clean paper coveralls will be supplied at the start of each shift; then for lunch, the workers will dispose of the dirty coveralls, then dispose of their respirator filters after lunch they will put on clean coveralls and respirators with new filters. At the end of the shift all contaminated coveralls will be disposed of by placement in the asbestos scrap bags.

(6) Suitable waste contains lined with disposable plastic bags will be kept available at the installation site so that discarded or scrap insulation materials can be immediately placed in them.

…

(8) High asbestos-containing scrap material should be wet down before collection, hauling or dumping. Personnel assigned to these tasks will be specifically advised on needed precautions . . .

(10) Portable dust collectors/industrial-type vacuum cleaners should be placed in use at the point of operations within confined spaces. They may be used to temporarily and partially clean a worker who has to leave the work area for a short time.

(11) Decks and spaces contaminated by insulation debris should not be dry swept. . .

COMPLAINT FOR WRONGFUL DEATH AND
SURVIVORSIHP - 24

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

87.     In July 1972, the Navy incorporated asbestos control measures into Chapter 9390 of the Naval Ships Technical Manual.

88.     For "Removal and Repair" Chapter 9390.3 of the Naval Ships Technical Manual ("Precautions for Dust Producing Materials (Particularly Asbestos) provided the following:

a. It is mandatory that respirators be worn during rip-out and repair operations.

b. Workers shall be supplied clean coveralls or disposable coveralls for each work shift involving "rip-out" of insulation.

c. Shipboard "rip-out" of insulation shall be accomplished in designated areas. Only personnel whose work requires their presence shall be permitted in such areas. All personnel entering these areas shall be advised of the hazard. Crewmen and others accomplishing essential duties in the removal area are required to wear respirators.

d. The area in which removal takes place shall be confined by means of curtains, portable partitions, etc., to prevent excessive contamination of other areas.

e.  Portable mechanical exhaust ventilation should be used to remove airborne dust. Air should be exhausted into bags or suitable devices to catch dust.

89.     On or about February 23, 1973, the Chief of Naval Operations issued OPNAV Instruction 5100.19 regarding "Navy Safety Precautions for Forces Afloat."

90.     OPNAV Instruction 5100.19 included a section regarding asbestos hazards, noting that "it is imperative" that certain precautions be observed during "rip-out" or tear out of asbestos-containing materials.

91.     The asbestos-related precautions set for the in OPNAV Instruction 5100.19 included the following:

(a) The area around "rip-out" operations should be isolated when possible by means of curtains, portable partitions, drop cloths, etc., to prevent excessive contamination of other areas. Adequate warning signs will be posted.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

(b) Only persons whose work requires their presence will be permitted in "rip-out" areas. . .

(d) Wherever possible, clean coveralls or disposable coveralls shall be provided at the beginning of each work period. Disposable coveralls shall be sealed in plastic bags and disposed of ashore. Other clothing shall be handled in such a manner as to minimize the spread of contamination and laundered at the end of each work period.

(e) Personnel shall shower at the end of each work period.

(f) Wherever possible, vacuum cleaners shall be used for cleanup of scrap material. Where vacuum cleans are not available or cannot be used, decks and spaces contaminated with asbestos shall be wet down with a fine water spray before sweeping. . .

(h) Discarded and scrap asbestos materials shall be immediately placed in plastic bags which are sealed for disposal ashore . . .

92.     OPNAV 5100.19 further directed naval personal to:

(a) TAKE EVERY PRECAUTION TO KEEP [asbestos] DUST TO A MINIMUM.

(b) WEAR APPROVED RESPIRATORS WHEN EXPOSED TO [asbestos] DUST.

(c) MAINTAIN GOOD HOUSEKEEPING AT ALL TIMES.

93.     On June 7, 1973, the Navy issued BUMED Instruction 6260.14 regarding "Asbestos; measures for control of."

94.     The June 7, 1973 BUMED Instruction 6260.14 required, in part, the following "Industrial Hygiene Control Measures":

(b)     Asbestos emission from asbestos fabrication, installation, or removal operations shall be prevented by the collection in bag filters of woven cotton fabrics having air flow permeabilities not exceeding 30 cubic feet per minute per square foot of fabric for woven fabrics or 35 cubic feet per minute per square foot for felted fabrics. . .

(c)     All hand-operated and power-operated tools which may produce or release asbestos fibers in excess of the permissible exposures concentrations shall be provided with local exhaust ventilation systems.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

(d)      As practicable, asbestos shall be handled, mixed, applied, removed, cut, scored, or otherwise worked in a wet state sufficient to prevent the emission of airborne fibers in excess of the permissible exposure concentrations.

. . .

(f)      No asbestos cement, mortar, coating, grout, plaster, or similar materiel containing asbestos shall be removed from bags, cartons, or other containers in which they are shipped, without being either wetted, or enclosed, or ventilated so ss to prevent the release of airborne asbestos fibers in excess of the permissible exposure concentration.

. . .

(h)      All external surfaces in places of employment shall be maintained free of accumulations of asbestos fibers.

(i)      Asbestos waste, scrap, debris, bags, contains, equipment, and asbestos-contaminated clothing consigned for disposal, which may in any reasonably foreseeable use, handling, storage, processing, disposal, or transportation, airborne concentrations of asbestos fibers in excess of the permissible exposure concentration shall be collected and disposed of in sealed impermeable bags, or other closed, impermeable containers, Prior to placing in bags, asbestos wastes shall be wet down to reduce airborne concentrations.

95.     Under the "Personal Protective Equipment" section, the June 7, 1973 BUMED Instruction 6260.14 required the Navy to supply change rooms at "any fixed place of employment" where "exposure to the airborne concentration of asbestos fibers is in excess of the permissible exposure limit."

96.     The "Personal Protective Equipment" requirements of the June 7, 1973 version BUMED Instruction 6260.14 were exacting, requiring:

(1)      Two separate lockers or containers for each person, so separated or isolated to prevent contamination of street clothes by work clothes, shall be provided.

(2)      Laundering of asbestos contaminated clothing shall be done so as to prevent release of airborne asbestos fibers in excess of the permissible exposure - concentration.

(3)      Anyone who gives asbestos contaminated clothing to another person for laundering shall inform such person of the requirements to prevent the release of asbestos in excess of the permissible exposure concentrations.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

(4)     Asbestos     contaminated     clothing     shall     be     transported     in     sealed impermeable bags or containers.

97.     The same BUMED Instruction 6260.14 contained explicit requirements regarding warnings, requiring that:

(a) Caution signs shall be provided and displayed at each location where airborne concentrations of asbestos fibers may exceed the permissible exposure concentration. Signs shall be posted at such a distance from such a location so that personnel may read the signs and take necessary steps before entering the area marked by the signs.

### ***Violations of the Navy's Asbestos Regulations***

98.     At all times mentioned herein, Defendant owned, maintained, managed, and/or controlled Puget Sound Naval Shipyard and the ships and buildings at the shipyard.

99.     Several individuals who worked on repairs and overhauls of the *USS Sacramento* at Puget Sound Naval Shipyard during the timeframe that H.P. was stationed on that vessel have previously testified about the working conditions on the *USS Sacramento*.

100.     The testimony of workers aboard the *USS Sacramento* demonstrates that the asbestos regulations detailed above were inconsistently followed or disregarded during the period of H.P.'s service on the *USS Sacramento*.

101.     For example, Charles Edwards, a machinist at Puget Sound Naval Shipyard from 1969 to 2002 who worked on the *USS Sacramento* between 1969 and 1975, testified that he was never provided any warning about the hazards of asbestos until the "late, late '70s" and not advised about the need to have respiratory protection around asbestos work until the same general period. *See* Deposition of Charles Edwards, taken on December 18, 2014 in *Rublee v. Carier Corp.*, Super. Ct. Wash. King County, No. 14-2-26353-8 SEA, at 14:17-16:17, 49:8-23, 50:15-25. Mr. Edwards further confirmed that insulating cements were

regularly prepared shipboard in a manner that would release dust throughout the working areas. *See id.* at 9:5-12:7, 16:23-18:2.

102.    Jerome Zetzsche, a former Navy molder who started working as an apprentice fabric worker at Puget Sound Naval Shipyard in 1973, testified that he worked on the *USS Sacramento* on loan to the "laggers" during his apprenticeship for multiple weeks. He testified that he cleaned up insulation debris left by the "laggers" using a foxtail broom and dustpan. *See* Perpetuation Deposition of Jerome Zetzsche, taken on January 28, 2022, in *Zetzsche v. ABB, Inc.*, Super. Ct. Wash. King County, No. 21-2-14455-8 SEA, at 59:15-62:16. During this dusty work, he was not provided with any sort of respiratory protection. *Id.* at 68:8-15.

103.    Maurice Canon, an apprentice in the fabric shop at Puget Sount Naval Shipyard who worked with Jerome Zetzsche, testified that he too was loaned out to the "laggers" during his apprenticeship to work on the *USS Sacramento*. Mr. Canon testified that he helped clean up insulation that the "laggers" were removing insulation from piping and equipment. *See* Discovery Deposition of Maurice Canon, taken on April 15, 2022, in *Zetzsche v. ABB, Inc.*, Super. Ct. Wash. King County, No. 21-2-14455-8 SEA, at 21:17-27:17. Mr. Canon confirmed that the insulation work was not contained "or anything like that" so people could pass through the area. *Id.* at 28:1-7. He likewise confirmed that he was not provided respiratory protection during his time with the laggers. *Id.* at 30:11-15, 69:22-70:10.

104.    None of the workers identified *supra* who have testified regarding the working conditions aboard the *USS Sacramento* at Puget Sound Naval Shipyard confirmed that any protective coveralls or laundry service were provided by the Navy to workers

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 • Seattle, WA  98101
Phone (206) 622-8000 • Fax (206) 682-2305

engaged in, or in the vicinity of, insulation and/or other asbestos-containing material ripout activities.

105.    Despite the promulgation of numerous asbestos regulations detailed above, such regulations and other similar policies were not consistently followed while H.P. was working aboard ships at Puget Sound Naval Shipyard from 1968 through the mid-1970s, which resulted in Geraldine Rabb Perkins being unwittingly exposed to asbestos para-occupationally and environmentally.

106.    The acts and omissions of the Defendant, United States of America, were not discretionary. In *Botts v. United States of America,* US District Court, Western District of WA, Cause No. C12-1943JLR, the Honorable James L. Robart entered an order dated August 5, 2013, which found, *inter alia*,

> [I]n March 1970, the Navy issued NAVMAT P-5100 *** which contains mandatory asbestos regulations.

*Botts* Order at 11:4-5, attached as Appendix A.

> Regulations from 1970 and 1972 required that asbestos removal sites be "confined by means of curtains, portable partitions, etc., so as to prevent excessive contamination of other areas." *** However, testimony of PSNS insulation workers indicate that asbestos work areas were usually only roped off. *** This indicates that mandatory regulations requiring asbestos containment measures may not have been followed. Although the "etc." and "when possible" terms did give the Navy some leeway in how it contained asbestos exposure, reading those terms to indicate that simply roping off an area complies with the regulations stretches the plain language of the regulation. Roping off an area is different in type from the containment examples given ("curtains, portable partitions"), and does very little to achieve the regulations' stated dust-containment purpose. As a further example of broken regulations, new regulations in 1971 prohibited naval personnel from cleaning up asbestos debris by dry sweeping and mandated vacuuming. *** The testimony of former PSNS insulation workers demonstrates that this regulation was not consistently followed.

*Id.,* at 13:3-17.

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA  98101
Phone (206) 622-8000 ● Fax (206) 682-2305

107.    A number of Defendant's employees worked removing, installing, or cleaning up asbestos-containing materials on board the ships that H.P. was on at Puget Sound Naval Shipyard from 1968 through the mid-1970s. Beginning in 1968, Defendant's policies at Puget Sound Naval Shipyard mandated the use of approved respirators during all asbestos work regardless of the airborne asbestos fiber concentrations. Numerous other regulations including those detailed above were intended to limit use of and exposure to asbestos at Naval shipyards. Such policies and other similar policies existing at that time frequently were not followed while decedent's husband was working at Puget Sound Naval Shipyard from 1968 through the mid-1970s, which resulted in H.P. not being warned or informed of the risks of para-occupational or environmental asbestos exposure, and thereby resulted in Geraldine Rabb Perkins being exposed to harmful levels of asbestos dust.

108.    Consequently, Geraldine Rabb Perkins was exposed to asbestos products and asbestos-containing materials, para-occupationally and environmentally. These exposures directly and proximately caused her to develop an illness known and designated as mesothelioma.

109.    On June 6, 2020, Geraldine Rabb Perkins died from her mesothelioma.

110.    The aforesaid injuries were proximately caused, *inter alia,* by Defendant, its agents, servants; suppliers, or employees, and without any negligence on the part of the Plaintiff or Plaintiff's decedent contributing thereto.

### III.    LEGAL CLAIMS

111.    Defendant owed a duty to Geraldine Rabb Perkins to exercise reasonable care with respect to conditions on its premises which posed unreasonable risks of harm to Ms. Perkins and others living in the vicinity. Defendant violated its duty of reasonable care

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

through its negligent use of asbestos-containing products that resulted in Ms. Perkins' injurious asbestos exposure.

112.    Defendant negligently failed to protect Ms. Perkins from exposure to asbestos by failing to follow its own regulations relating to the use, handling, and removal of asbestos products and asbestos-containing materials.

113.    Defendant also failed to warn Mr. or Ms. Perkins of the danger of exposure to asbestos and failed to protect Ms. Perkins from inhaling asbestos-containing dust that was released into the atmosphere in proximity to Puget Sound Naval Shipyard.

114.    Defendant owed a duty to provide a safe workplace so that Harang Perkins was not exposed to asbestos and permitted to leave the workplace contaminated with asbestos fibers that he then brought home to his family. Defendant violated its duty because it negligently failed to protect Mr. Perkins from coming into contact with asbestos-containing dust and/or reducing the likelihood that he would inadvertently bring that dust home on his clothing and person.

115.    As a proximate cause of Defendant's actions, Geraldine Rabb Perkins developed the disease of mesothelioma, and subsequently died from the same.

## IV.    DAMAGES

106.    As a proximate result of Defendant's tortious conduct, Plaintiff's decedent Geraldine Rabb Perkins sustained pain, suffering, disability, and loss of life, in an amount not now known, but which will be proven at trial. Plaintiff's decedent Geraldine Rabb Perkins also sustained medical expenses, economic losses, and funeral expenses, in an amount to be proven at trial. Plaintiff Tristan Rose Perkins and her siblings, Enola Perkins, Jill Perkins,

Kwame Perkins, and Lisa Perkins, sustained loss of the parent-child relationship as a result of Plaintiff's decedent Geraldine Rabb Perkins' illness and death.

107.    The statutory beneficiaries of a wrongful death claim, namely Plaintiff and those provided by law, have suffered damages on account of the death of decedent for the loss of monetary contributions the decedent would have made to them; for funeral expenses; and for the loss of love, care, affection, services, companionship, guidance, and society of the decedent with them. Plaintiff has suffered the following damages:

A.    For general and special damages specified above, including pain, suffering, disability, death, and loss of parental consortium;

B.    For medical and related expenses, and economic loss, all of which will be proven at the time of trial;

C.    For Plaintiff's costs and disbursements herein;

D.    For prejudgment interest in an amount to be proven at trial; and

E.    For such other relief as the Court deems just.

//

//

//

//

SCHROETER, GOLDMARK & BENDER
401 Union Street, Suite 3400 ● Seattle, WA 98101
Phone (206) 622-8000 ● Fax (206) 682-2305

1

## V.   PRAYER FOR RELIEF

2       WHEREFORE, Plaintiff prays for judgment against Defendant for the above

3   damages, for costs and attorneys' fees incurred in bringing this action and for such other

4   relief as the Court may deem just and reasonable.

5

6       DATED this 19th day of September, 2022.

7                           SCHROETER, GOLDMARK & BENDER

8                           s/ Lucas Garrett
                            LUCAS GARRETT, WSBA #38452

9                           s/ Colin B. Mieling
10                          COLIN B. MIELING, WSBA #46328

11                          s/ Craig A. Sims
                            CRAIG A. SIMS, WSBA #28267

12                          s/ Kaitlin T. Cherf
13                          KAITLIN T. CHERF (WRIGHT), WSBA #45241

14                          401 Union Street, Suite 4300
15                          Seattle, WA  98101
                            Phone:  (206) 622-8000
16                          Fax:     (206) 682-2305
                            Email: SGBasbestos@sgb-law.com;
17                                   garrett@sgb-law.com;
                                     mieling@sgb-law.com;
18                                   csims@sgb-law.com;
                                     wright@sgb-law.com
19
20                          Counsel for Plaintiff

21

22

23

24

25

26