UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| TRISTAN ROSE PERKINS, Independent Administratrix of Succession of the Decedent GERALDINE RABB PERKINS,<br><br>        Plaintiff,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | CASE NO.  3:22-cv-05701-RJB<br><br>ORDER ON UNITED STATES' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on the United States' Combined Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Summary Judgment.  Dkt. 51.  The Court has considered the pleadings filed in support of and in opposition to the motion, oral argument heard on May 2, 2024, and the file herein.

This case arises from the June 6, 2020 death of Geraldine Rabb Perkins from pleural mesothelioma allegedly caused by para-occupational and environmental exposure to asbestos fibers originating from Puget Sound Naval Shipyard ("PSNS").  Dkt. 1.  Her husband, Harang Joseph Perkins, an enlisted Navy Machinist Mate, was stationed at PSNS between 1968 and

1974 and worked aboard the *U.S.S. Sacramento*. *Id.* Mrs. Perkins did his laundry and the family lived in a home approximately a mile from PSNS. *Id.* The Plaintiff, Mrs. Perkins' daughter and administratrix, sues the United States under the Federal Tort Claims Act, ("FTCA") 28 U.S.C. § 2671 *et. seq.*, for negligence. *Id.* A bench trial in this case is set to begin on June 10, 2024.

The United States now moves to dismiss the case, arguing that after discovery, the facts show that it is entitled to dismissal because sovereign immunity was not waived under the discretionary function exception to the FTCA. Dkt. 51. It contends that even if the discretionary function exception does not apply, it is entitled to summary judgment because the Plaintiff cannot show that actionable Navy conduct was a substantial factor in Mrs. Perkins's disease. *Id.* The United States also argues that summary judgment should be granted on the Plaintiff's environmental exposure claim because the Navy owed no duty to protect PSNS neighbors from asbestos exposure. *Id.* For the reasons provided below, the government's motion to dismiss based on the discretionary function exception (Dkt. 51) should be denied without prejudice and the motion for summary judgment (Dkt. 51) should be denied.

## I.   FACTS

The following facts and reasonable inferences are taken in a light most favorable to the Plaintiff as is proper for a motion for summary judgment. Fed. R. Civ. P. 56. The Court is aware that much of the evidence is sharply disputed. The facts and inferences recited here are in no way to be construed as findings of fact for trial.

**A.   MR. PERKINS'S NAVAL SERVICE AND MRS. PERKINS'S ACTIVITIES DURING THE RELEVANT PERIOD**

Mr. Perkins served as a Machinist Mate in the Navy. Dkt 15-4. Machinist Mates' work involved making repairs to insulation and operating and repairing a "wide variety of equipment," including a ship's main engines and associated equipment such as "pumps, distilling plants,

compressors, valves, . . . [and] heat exchangers . . . ." Dkts. 67-51 at 4 and 67-52 at 4. They maintained "all . . . lagging." Dkt. 67-52 at 5.

On September 3, 1968, the Navy transferred Mr. Perkins to PSNS. Dkt. 15-4 at 3. Mrs. Perkins and their children moved with him and lived near the base in Bremerton, Washington. Dkt. 1 at 6. She did his laundry. Dkt. 21. By the time he arrived at PSNS, Mr. Perkins was a Machinist Mate First Class ("MM1"). Dkt. 15-4. The government's proffered expert, Christopher Herfel, states that an MM1 was "a first-line supervisor," was "less hands-on" than the junior machinist mates regarding maintenance and was more "managerial." Dkt. 53-2 at 22.

According to his December 17, 1969 to June 8, 1970 performance evaluation, Mr. Perkins was reassigned to maintenance of the steam heating system of vessels at PSNS. Dkt. 15-4 at 13. Contrary to Mr. Herfel's statements, Mr. Perkins's performance evaluation states that his work included "maintain[ing] and repair[ing] steam leaks by replacing lines, thermostats and maintain[ing] all heating and ventilation systems onboard . . ." Dkt. 15-4 at 14.

On June 22, 1970, Mr. Perkins was deployed to Danang, Vietnam. Dkt. 15-4 at 3. In May of 1971, Mr. Perkins joined the *USS Sacramento* (Dkt. 15-4 at 4) while she was at sea. During the time Mr. Perkins was onboard and until August 1971, the *USS Sacramento* provided support to the United States fleet combat operations in Southeast Asia. Dkt. 15-4 at 27.

In his June 2, 1971 to December 1, 1971 performance evaluation, it was noted that Mr. Perkins was "assigned to the [forward] engine room for maintenance and supervisory duties." Dkt. 15-4 at 11. The evaluator noted that Mr. Perkins "desires an opportunity to obtain training in areas he feels he is not fully qualified in. [Mr. Perkins] is presently involved in an extensive overhaul and is doing his best to learn, do and lead . . ." Dkt. 15-4 at 11.

By December 1, 1971, the *USS Sacramento* was at PSNS in Bremerton, Washington for an overhaul. Dkt. 15-5 at 5. (The Navy concedes that overhaul of naval vessels like the *USS Sacramento* involved ripping out or disturbing asbestos-containing thermal insulation in the engine room and main machinery spaces. Dkt. 67-29 at 32-33.) The Navy sent Mr. Perkins to a training school in California from January 22, 1972 to April 20, 1972. Dkt. 15-4 at 20.

After attending training "pertinent to his rate," Mr. Perkins returned to PSNS and the *USS Sacramento*. Dkt. 15-4 at 9. According to his performance evaluation, dated December 2, 1971 to June 1, 1972, it was noted that after returning from training, he initially was assigned as a training assistant for a month (until around May 20, 1972)." *Id*. He was then transferred to the "POL Division," to get him "back in the Petty Officer business." *Id*. Mr. Perkins' service record does not indicate what the "POL Division" was, but according to the government's expert, Mr. Herfel, the "POL Division" was part of the "Petroleum, Oil, Lubricants gang." Dkt. 53 at 6. Mr. Herfel opines that as a member of the "POL gang," Mr. Perkins was no longer working in the ship's main machinery space and any work Mr. Perkins performed on the petroleum systems was "not likely" to involve asbestos-containing products. *Id*.

On August 12, 1972, Mr. Perkins was admitted to the hospital and was not released until November 9, 1972. Dkt. 15-4 at 6. The parties do not contend that his hospitalization was related to asbestos exposure. After his release from the hospital, Mr. Perkins was placed on permanent limited duty and worked at PSNS's Special Services Hobby Shop, bowling alley, and the barracks. *Id*. at 6-7. He was transferred to Corpus Christie, Texas in March of 1974, and his family, including Mrs. Perkins, went with him. *Id*. at 22.

**B.  ASBESTOS GENERALLY, PSNS, ASBESTOS POLICIES AND THIS CASE**

Asbestos is considered a "complete carcinogen, which means it can both initiate and promote cancer." Dkt. 62 at 17.  The causal relationship between exposure to asbestos and mesothelioma "is so firmly established . . . that mesothelioma is considered a 'signal' tumor for asbestos exposure." *Id.* at 18.  Asbestos exposure need not be related to a person's job to cause injury; para-occupational and environmental exposures are also recognized as possibly detrimental.  *Id.* at 23-31.

By around 1965, the United States Navy was aware of hazards posed by para-occupational and environmental asbestos exposures.  Dkt. 67-6 at 7-8.  After various studies and regulations regarding asbestos were issued, in March of 1970, the Navy issued "NAVMAT P-5100" through Naval Material Command, which implicated asbestos workers and people not working directly with asbestos.  Dkts. 15-8 at 5 and 17-28.  As is relevant here, NAVMAT P-5100 provides, in part:

> The most significant exposure to asbestos dust occurs during the ripout or tearout of asbestos materials aboard ship. Exposures also result during the production and installation of asbestos containing materials. The following precautions are required for the safe handling of asbestos products:
>
> a. General precautions . . .
>
>> (2) Asbestos dust concentrations shall be controlled so as not to exceed the threshold limit value for asbestos as stated in the current BUMED INSTRUCTION 6260.3[1] series titled "Threshold limit values for airborne toxic materials."
>>
>> (3) Scrap material shall be wet down before shoveling, hauling or dumping.

---

[1] BUMED INSTRUCTION 6260.3 set the threshold limit value for asbestos at 5 million particles per cubic foot ("mppcf").  Dkt. 67-13 at 2.

ORDER ON UNITED STATES' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT - 5

>    (4) Discarded and scrapped asbestos materials shall immediately be placed in plastic bags which are then to be sealed for removal and disposal. . .
>
>  c. Removal, Repair and Installation.
>
>    (1) It is mandatory that dust respirators approved by the Bureau of Mines be worn during ripout and repair operations.
>
>    (2) Personnel engaged in ripout operations will be provided and required to wear clean coveralls at the beginning of each shift. Prior to removing the dust respirator, used coveralls shall be removed. Clean or single-use coveralls shall be provided daily.
>
>    (3) Shipboard "ripout" of insulation shall be accomplished in designated exclusion areas. Only personnel whose work requires their presence shall be permitted in such areas. All personnel entering such areas shall be made aware of the hazards. Ships' force (crewmen) and others accomplishing essential duties in the removal area are required to wear approved respirators.
>
>    (4) The area in which removal takes place shall be confined by means of curtains, portable partitions, etc., to prevent excessive contamination of other areas. . . .
>
>    (8) When working in confined spaces, portable dust collectors or exhaust blowers shall be provided to remove dust from the source. . . . .
>
>    (9) Dust shall not be exhausted into other working areas.

Dkt. 15-15 at 22-23. NAVMAT P-5100 further provides that it applies to "all Navy personnel, Military and Civilian, to all Naval commands and activities ashore." Dkt. 15-15 at 22. While NAVMAT P-5100 was issued by Naval Material Command, the Chief of Naval Operations assigned it the duty to "promulgat[e] safety precautions to the activities of the entire Navy." Dkt. 15-8 at 5, n, 1.

On February 9, 1971, Naval Ship Systems Command, "which encompassed all the Navy's shipyards," (Dkt. 15-8 at 6) issued NAVSHIPS INSTRUCTION 5100.26 ("NAVSHIPS INST 5100.26") detailing safety precautions that "will be observed by all supervisors and

ORDER ON UNITED STATES' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT - 6

workers engaged in the fabrication, installation and or removal (rip-out) of asbestos-containing insulation/material" (Dkt. 15-16). For example, it provided that "[i]n removal operations that involve dusty work, clean paper coveralls will be supplied at the start of each shift; then for lunch, the workers will dispose of the dirty coveralls, then dispose of their respirator filters. After lunch, they will put on clean coveralls and respirators with new filters. . . ." Dkt. 15-16 at 7. NAVSHIPS INST 5100.26 also provided that the provisions were "effective as of this date" and that "more stringent restrictions may be applied by local Commanders." Dkt. 15-16 at 2.

On September 26, 1974, after the Perkins family left PSNS in Bremerton for Texas in the spring of 1974, PSNS issued local instruction, NAVSHIPYDPUGETINST 6260.11, which addressed asbestos workplace practices. Dkt. 15-8. Many years later, on February 21, 2020, Mrs. Perkins was diagnosed with pleural mesothelioma.[2] Dkt. 1 at 7. She succumbed to her illness and died on June 6, 2020. *Id.* Her daughter filed this case on September 19, 2022 asserting a negligence claim pursuant to the FTCA. *Id.*

## II.     DISCUSSION

### A. MOTION TO DISMISS AND SUMMARY JUDGMENT STANDARD

A complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if, considering the factual allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the Constitution, laws, or treaties of the United States, or does not fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or controversy within the meaning of the Constitution; or (3) is not one described by any jurisdictional statute. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v.*

---

[2] The United States disputes this diagnosis, but for purposes of its motion, it presumes that mesothelioma was the cause of death. Dkts. 51 at 7 n. 1 and 54 at 2.

ORDER ON UNITED STATES' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT - 7

*Tinnerman*, 626 F. Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as a defendant).

The United States, as sovereign, is immune from suit unless it consents to be sued. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Cato v. United States*, 70 F.3d 1103, 1107 (9th Cir. 1995). The FTCA, the statute upon which this case is brought, is a limited waiver of sovereign immunity. *See* 28 U.S.C. § 1346 (b). (The FTCA is the exclusive remedy for state law torts committed by federal employees within the scope of their employment. 28 U.S.C. § 2679 (b)(1)). "The FTCA was created by Congress with the intent to compensate individuals harmed by government negligence, and as a remedial statute, it should be construed liberally, and its exceptions should be read narrowly." *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008).

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial, which is a preponderance of the evidence in most civil cases. *Anderson* at 254; *T.W. Elect.* at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect.* at 630 (*citing Anderson* at 255). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888–89 (1990).

**B. MOTION TO DISMISS – DISCRETIONARY FUNCTION EXCEPTION TO FTCA'S WAIVER OF SOVEREIGN IMMUNITY**

The government moves to dismiss the case arguing that the discretionary function exception applies. Dkt. 51. "The discretionary function exception insulates certain governmental decision-making from judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Myers v. U.S.*, 652 F.3d 1021, 1028 (9th Cir. 2011). The Plaintiff bears the "burden of showing there are genuine issues of material fact as to whether the exception should apply, but the government bears the ultimate burden of establishing that the exception applies." *Schurg v. United States of Am.*, 63 F.4th 826, 831–32 (9th Cir. 2023).

A two-step test is used to determine whether the discretionary function applies. *Terbush* at 1129. In the first step, the court determines "whether challenged actions involve an element of

judgment or choice." *Id.* "The discretionary element is not met where a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.* The inquiry ends if there is such a statute or policy directing mandatory and specific action because there can be no element of discretion when an employee "has no rightful option but to adhere to the directive." *Id.* If the challenged actions do involve an element of judgment or choice, then the court turns to the second step in the test. *Id.*

Regarding step one of the exception, there are issues of fact as to whether NAVMAT P-5100 and NAVSHIPS INST 5100.26 were mandatory directives requiring action by the government and whether the government failed to follow those directives.

**Mandatory Directives**. The Plaintiff points to two sources of mandatory asbestos directives she contends the Navy was required to follow and did not: the March 1970 NAVMAT P-5100 and the February 1971 NAVSHIPS Instruction 5100.26. Dkt. 66. As stated above, NAVMAT P-5100 contains several asbestos related precautions and provides that it applies to "all Navy personnel, Military and Civilian, to all Naval commands and activities ashore." Dkt. 15-15 at 22. NAVSHIPS INST 5100.26 stated that its "safety precautions will be observed by all supervisors and workers engaged in the fabrication, installation and/or removal (rip-out) of asbestos-containing insulation/material" (Dkt. 15-16 at 2) and "encompassed all the Navy's shipyards" (Dkt. 15-8 at 6). The plain language of these regulations appears to be mandatory.

The government points to the deposition testimony of Roger Beckett, Cory Brickman, and Christopher Herfel, in support of its position that regulations before 1974 were advisory in nature and not mandatory. Dkts. 51 and 70. While Mr. Beckett contends in this case that the directives in NAVMAT P-5100 were not mandatory because Naval Material Command, the entity that issued NAVMAT P-5100, was not in PSNS's chain of command, in another asbestos

case, Mr. Beckett stated that "[e]ven though the Naval Material Command was but one command within the Navy at the time, the Chief of Naval Operations had assigned the responsibility of promulgating safety precautions to the activities of the entire Navy in OPNAV Instruction 5100.8." Dkt. 15-8 at 5 n. 1. Mr. Beckett also stated in his declaration that the February 1971 NAVSHIPS INST 5100.26 was issued by "Navy Ship Systems Command, which encompassed all the Navy's shipyards."[3] Dkt. 15-8 at 6. Mr. Beckett's inconsistent testimony creates a factual dispute as to whether NAVMAT P-5100 and NAVSHIPS INST 5100.26 constituted mandatory directives for purposes of the FTCA's discretionary function analysis. The United States reliance on the opinion of Cory Brickman and Christopher Herfel is likewise unavailing. Mr. Brickman acknowledged that he based his opinion on Mr. Beckett's opinion and Mr. Herfel has conceded that he was not qualified to render an opinion.

The United States also points to an April 14, 1972 memorandum (Dkt. 52-5) and portions of a February 1977 audit (Dkt. 52-6) to support its position that NAVMAT P-5100 and NAVSHIPS INST 5100.26 were not mandatory before 1974. The 1972 memorandum detailed portions of NAVMAT P-5100 that had not yet been complied with; it does not indicate whether the regulation was mandatory. Dkt. 52-5. The 1977 audit found that "[n]o written controls exist[ed] for protecting or sealing cut ends of asbestos insulation," including that for cut lagging on ends of pipe. Dkt. 52-6. It does not indicate whether any of the relevant regulations were mandatory.

---

[3] Mr. Becket testified in another case that compliance with NAVSHIPS INST 5100.26 was "required, not recommended." Dkt. 69-1 at 15.

ORDER ON UNITED STATES' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT - 11

The Plaintiff has pointed to regulations, which on their face appear to be mandatory directives. The government has proffered testimony and documents, which have created an issue of fact as to whether those regulations were mandatory.

**Failure to Follow Mandatory Directives**. The next issue then, is whether there is evidence that the government failed to follow the mandatory directives in NAVMAT P-5100 or NAVSHIPS INST 5100.26. NAVMAT P-5100 and NAVSHIPS INST 5100.26 both required the provision of coveralls for people involved in the ripout of asbestos containing items. Dkts. 15-15 and 15-16. They also set requirements regarding the handling of asbestos to minimize the release of asbestos fibers into the air. *Id*.

The Navy's 30(b)(6) witness concedes that it does not have any documentary evidence that PSNS adhered to any mandatory asbestos-related regulations and policies at PSNS's Naval Inactive Ship Maintenance Facility while Mr. Perkins was there (before June of 1970), during the overhaul of the *USS Sacramento* between 1971-1972, or between 1970-1974. Dkt. 67-29 at 16-18; 24-25. This includes documentary evidence regarding the provision of coveralls for people involved in removal of asbestos containing material and shipboard air monitoring for asbestos. Dkt. 67-29 at 15.

The government argues that none of the regulations on which the Plaintiff relies applies here and so the discretionary function applies. Dkt. 51 at 27. Contrary to the government's assertions, there are issues of fact as to whether the mandatory regulations applied and whether the government complied with those regulations.

The United States argues that even if NAVMAT P-5100 or NAVSHIPS INST 5100.26 were mandatory directives, there is no evidence Mr. Perkins was engaged in "ripout" (removal) of asbestos containing materials during the relevant period, so it was not required to provide him

coveralls. Dkt. 51. Contrary to the government's assertion that MM1s were only managers and did not perform maintenance, information from Mr. Perkins's performance evaluations could lead a fact finder to granting Plaintiff a reasonable inference that he was engaged in the "ripout" or "tearout" of asbestos after March of 1970 when the directives in NAVMAT P-5100 were arguably mandatory. Further, considering that her daughter remembers her mother shaking out his dusty uniforms, a fact finder could find that the Plaintiff is entitled to an inference that PSNS failed to provide him coveralls. At a minimum, there are issues of fact as to whether Mr. Perkins was engaged in activity which would have required the government to provide him coveralls and whether it did provide him those coveralls.

Likewise, there are issues of fact as to whether the government was adhering to the NAVMAT P-5100 and NAVSHIPS INST 5100.26's requirements regarding asbestos emission control rules from March 1970 until March of 1974 (when the Perkins family left Bremerton). For example, the Plaintiff points out that NAVMAT P-5100 required asbestos scrap to "be wet down before shoveling, hauling or dumping," and "discarded and scrapped asbestos materials shall immediately be placed in plastic bags which are then to be sealed for removal and disposal." Dkt. 15-15 at 23. She then points to asbestos surveys from 1973, which viewed in a light most favorable to her, indicate that asbestos scrap was being handled in a manner which was contrary to NAVMAT P-5100 and was causing airborne asbestos to exceed allowable limits. Dkt. 66 at 29 (*citing* Dkt. 67-65). Further, a court in this district has already held that there are issues of fact as to whether PSNS was adhering to NAVMAT P-5100 and NAVSHIPS INST 5100.26's asbestos emission control requirements in the early 1970s. *See Botts v. U.S.,* 12-cv-1943-JLR, 2013 WL 6729002 at 6-7 (W.D. Wash. Dec. 20, 2013)(*rev'd and remanded on other grounds*, 650 Fed. Appx. 325 (9th Cir. 2016)).

Arguably, the government did not carry its burden at step one. Accordingly, the inquiry on whether the discretionary function exception applies ends there, and consideration of step two is unwarranted. *Nieves Martinez* at 876.

The United States' motion to dismiss the Plaintiff's FTCA claim based on the discretionary function exception (Dkt. 51) should be denied without prejudice, subject to it being re-raised, if appropriate, at trial. There are several issues of fact to be resolved before it can be determined whether the exception applies.

## C. MOTION FOR SUMMARY JUDGMENT

The Plaintiff asserts an FTCA claim for negligence. Under the FTCA, the law of the state where the tort allegedly occurred controls issues of liability. *Pacheco v. United States,* 31 F.4th 1183, 1187 (9th Cir. 2022). To prevail on a negligence claim under Washington law, a plaintiff "must show (1) the existence of a duty to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury." *Turner v. Washington State Dep't of Soc. & Health Servs*., 198 Wash.2d 273, (2021)(*internal quotation marks and citations omitted*).

The United States argues that summary judgment should be granted on the Plaintiff's environmental exposure claim because the government did not owe a duty (element one) to PSNS neighbors before March of 1974. Dkt. 51. It reasons that it was not foreseeable to the Navy that environmental exposure of asbestos fibers from PSNS presented a hazard to its neighbors in 1970-1974. *Id.*

"Under Washington law, duty encompasses the concept of foreseeability. Washington courts look to evidence specifically addressing the foreseeability of risks to someone in the [decedent's] position." *Jack v. DCo, LLC,* 837 F.App'x 421, 422 (9th Cir. 2021)(*internal*

*quotation marks and citations omitted*).  A harm is foreseeable if the defendant knew or should have anticipated an unreasonable risk of danger to the decedent.  *See Jack v. Borg-Warner Morse Tec, LLC*, 2018 WL 4409800, at *10 (W.D. Wash. Sept. 17, 2018) *aff'd sub nom. Jack v. DCo, LLC*, 837 Fed. Appx. 421 (9th Cir. 2021)(*citing Lockwood v. AC & S*, 744 Wash. App. 330 (1986), *aff'd*, 744 P.2d 605 (Wash. 1987)).

        The Plaintiff has pointed to sufficient issues of fact regarding whether the harm to Mrs. Perkins was foreseeable at the time.  She points to various studies available to the Navy from which a factfinder could conclude that the Navy had a duty to her.  Further, the foreseeability of harm to neighbors of PSNS would follow from the March 1970 and February 1971 regulations regarding the handling of asbestos.  That her actual harm (Mrs. Perkins developing mesothelioma) was not anticipated, is immaterial.  Under Washington law:

> Regarding foreseeability, whether foreseeability is being considered from the standpoint of negligence or proximate cause, the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated.

*Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 288 (2021).  There are issues of fact as to whether the United States owed a duty to Mrs. Perkins.

        The United States further argues that summary judgment is appropriate because the Plaintiff cannot show that Mrs. Perkins's disease was caused (element four) by the negligent violation of a mandatory and specific federal asbestos safety rule.  Dkt. 51.  The parties agree that Washington courts use the "substantial factor" causation test in asbestos cases.  Dkts. 51 and 66.

There are issues of fact as to whether PSNS's failure to provide Mr. Perkins coveralls and failure to follow mandatory regulations regarding asbestos fiber emissions were "substantial factors" in causing Mrs. Perkins' mesothelioma based on Plaintiff's experts' opinions.

As stated above, there are issues of fact as to whether Mr. Perkins was engaged in asbestos ripout work during the time in which Mrs. Perkins was doing his laundry. Moreover, Mr. and Mrs. Perkins' daughter testified that she recalled the family had a small laundry room in Bremerton. Dkt. 21 at 4. She remembers her mother shaking out her father's dusty uniforms in that room before laundering them. *Id*. She remembers that the dust and dirt from her father's uniforms would "go airborne, and [her] mother breathed that dust into her lungs." *Id*. The Plaintiff has produced evidence from which a factfinder could grant her an inference at trial that because the uniforms were dusty, the Navy did not supply Mr. Perkins with coveralls as it was required to do pursuant to NAVMAT P-5100 and NAVSHIPS INST 5100.26.

Further, the Plaintiff offers the testimony of Dr. Richard Kradin, who opines that Mrs. Perkins died of sarcomatoid malignant mesothelioma. Dkt. 62 at 9. He states that:

> Low levels of [asbestos] exposure above background have been shown medically and scientifically to cause mesothelioma. It has also been repeatedly and consistently demonstrated in the medical and scientific literature that family members exposed to asbestos dust from laundering worker's clothing have a significantly increased risk of developing mesothelioma. Researchers have confirmed that this risk is substantially, in excess of two times that of the general population.

Dkt. 62 at 44. He further opines that:

> [Mrs. Perkins's] asbestos exposures, both through the laundering of her husband's contaminated work clothing as well as through the environmental exposures she sustained residing near [PSNS] during the timeframe of March 1970 - March 1974 constitute significant exposures that were **each** substantial contributing factors in the development of her mesothelioma: they are both of the nature, type, and duration that have been shown to cause mesothelioma in the medical and scientific literature and are non-trivial in the context of her overall lifetime asbestos exposure.

ORDER ON UNITED STATES' MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT - 16

Dkt. 62 at 4 (*emphasis added*).

There are also issues of fact as to whether the Navy's failure to follow mandatory directives in NAVMAT P-5100 and NAVSHIPS INST 5100.26 was a substantial factor in causing Mrs. Perkins's mesothelioma from environmental exposures. The Plaintiff offers the testimony of Dr. Nicholas Heyer, who opines that the Navy's adherence to the regulations attempting to limit airborne asbestos was "very minimal," that the Navy's failure to adhere to the regulations increased the level of asbestos in the air for those working at PSNS and those living nearby. Dkt. 61 at 45. Dr. Heyer further opines that due to the Navy's failure to comply with those regulations, "an individual residing in a home situated <0.5 mile and <2,000 meters from PSNS in the 1970-1974 timeframe would be at significantly increased risk of mesothelioma." Dkt. 61 at 45. (The Perkins' home was around a mile from PSNS). Dr. Heyer contends that "had the Navy's mandatory industrial hygiene policies relating to the fabrication, installation, removal and repair of asbestos-containing materials been followed at PSNS in the time period from March 1970 to March 1974, [Mrs. Perkins's] asbestos exposure and risk for mesothelioma would have been substantially and significantly reduced." *Id.*

The United States points to contrary expert witness opinions. There are simply too many issues of fact on foreseeability and causation, precluding summary judgment for the government.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- The United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Dkt. 51) **IS DENIED WITHOUT PREJUDICE** as to the discretionary function exception; and

- The United States' Motion for Summary Judgment (Dkt. 51) **IS DENIED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 7th day of May, 2024.

*Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge